IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LAEROC WAIKIKI PARKSIDE, LLC, ) | CIVIL NO. 06-00006 SOM/LEK |
| ) | |
| Plaintiff, ) | |
| ) | ORDER GRANTING MOTION FOR |
| vs. ) | SUMMARY JUDGMENT (DOC. # 59) |
| ) | |
| WESTCHESTER FIRE INSURANCE ) | |
| COMPANY; WESTCHESTER SURPLUS ) | |
| LINES INSURANCE COMPANY; DOES ) | |
| 1-100, ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DOC. # 59)

I.      INTRODUCTION.

        This is a diversity action that was originally filed in
a California state court on July 30, 2004.  This action was
removed to the federal court and transferred to this district.
On May 3, 2007, Plaintiff Laeroc Waikiki Parkside, LLC, owner of
a building in Waikiki, filed a First Amended Complaint.  The
First Amended Complaint seeks insurance coverage under two
policies, numbers FPS 688087 and WPS 691583, for water and mold
damage that Laeroc at one time attributed to faulty insulation
surrounding chilled water pipes in the building.  Because Laeroc
did not timely file this action, Defendants'[1] motion for summary
judgment is granted.

---

        [1]Defendants are sometimes referred to collectively as
"Westchester" in this order.

II.      SUMMARY JUDGMENT STANDARD.

Effective December 1, 2007, Rule 56(c) of the Federal Rules of Civil Procedure has been amended.  Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (effective Dec. 1, 2007).  "The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only."  Rule 56 Advisory Committee Notes, 2007 Amendments.  Because no substantive change in Rule 56(c) was intended, the court interprets the new rule by applying precedent related to the prior version of Rule 56(c).

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both

2

the initial burden of production and the ultimate burden of
persuasion on a motion for summary judgment.  Nissan Fire &
Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir.
2000).  The burden initially falls on the moving party to
identify for the court "those portions of the materials on file
that it believes demonstrate the absence of any genuine issue of
material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp.,
477 U.S. at 323); accord Miller, 454 F.3d at 987.  "A fact is
material if it could affect the outcome of the suit under the
governing substantive law."  Miller, 454 F.3d at 987.

        When the moving party fails to carry its initial burden
of production, "the nonmoving party has no obligation to produce
anything."  In such a case, the nonmoving party may defeat the
motion for summary judgment without producing anything.  Nissan
Fire, 210 F.3d at 1102-03.  On the other hand, when the moving
party meets its initial burden on a summary judgment motion, the
"burden then shifts to the nonmoving party to establish, beyond
the pleadings, that there is a genuine issue for trial."  Miller,
454 F.3d at 987.  This means that the nonmoving party "must do
more than simply show that there is some metaphysical doubt as to
the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The
nonmoving party may not rely on the mere allegations in the

3

pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

III.    BACKGROUND FACTS.

A.   Problems With the Building.

There is no dispute that Laeroc purchased the building, a hotel, from KSK (Oahu) Limited Partnership on or about August 24, 2001.  Before buying the building, Laeroc hired Certified Environments Inc. ("CEI") to assess the property's condition. See Declaration of Kim Benjamin (July 25, 2008) ¶¶ 5, 7.  Laeroc says that CEI's report did not mention any water or mold damage. Id. ¶ 5.

4

Kim Benjamin, Laeroc's president, says that, from August 2001 through December 17, 2001, Condotech's Hawaiiana Resorts, Inc., managed the hotel for Laeroc.  During that period, no one from Hawaiiana told Laeroc the hotel had any water or mold damage.  Id. ¶¶ 7, 9.  On December 17, 2001, Aston took over management of the hotel from Hawaiiana.  Id. ¶ 11.  Aston apparently realized there was damage arising from condensation problems by January 2002.  See id. ¶¶ 14-15.  Laeroc's attorney says that ResortQuest Hawaii, formerly Aston, had several reports in January 2002 describing water damage in the hotel.  See Ex. 1 to Glenn Sato Decl. (January 7, 2002, report describing the condensation damage to the hotel "from saturated chill water lines"); Ex. 2 to Sato Decl. (January 8, 2002, report describing damage to the hotel "from condensation occurring on saturated chill water risers"); Laeroc's Answer to Interrogatory Nos. 9, 10 (May 6, 2008) ("ResortQuest Hawaii, LLC ('Aston'), Laeroc Waikiki Parkside, LLC's ('Laeroc') management company first became aware of WATER DAMAGE in January 2002.") ("Aston first became aware of MOLD DAMAGE (inclusive of the corridor walls) in January 2002."). It is unclear from the record when Aston told Laeroc about those problems, possibly not until April 2002.  Id. ¶ 17 (indicating that, when Benjamin (Laeroc's president) visited the hotel in April 2002, he was told about the condensation damage by Gary Ettinger (Aston) and Kelvin Bloom and about the need to change

5

the insulation around the chilled water lines).  At the hearing

on this motion, Laeroc conceded that Benjamin knew about the

water damage from the chilled water pipes by at least the first

two weeks of April 2002.  The damage was to the interior walls of

the hotel rooms.

The previous month, on March 22, 2002, Aston was told

about various physical problems with the hotel.  <u>See</u> Letter from

Ather R. Dar (Hawaii Engineering Group, Inc.) to Hakim Ouansafi

(Aston) (Ex. 6 to Declaration of Glenn K. Sato).  These problems

involved the pool deck area, lanai slabs, exterior paint and

windows, door caulking, termite infestation, roof leaks, and

concrete damage.  <u>Id.</u>  Although Laeroc says this letter

identified water and mold damage, the letter actually says

nothing about water and mold damage to the interior walls of the

hotel.  Instead, the letter merely notes in a section regarding

"Exterior Paint & Windows/Door caulking" that "fungus and mildew"

were seen.  The context in which the "fungus and mildew" are

mentioned makes it clear that the "fungus and mildew" was on the

exterior of the building.  Thus, "fungus and mildew" are

mentioned in the same sentence as "Staining from automotive

fumes, road grime, [and] dirt."  This reading of the report is

supported by the proposed "solution," which only sought to "Paint

building exterior along with necessary plaster repairs" and to

"Clean and caulk windows and doors with proper sealants."  <u>Id.</u>

Moreover, the section referring to "fungus and mildew" is
supported by photographs attached to the report, none of which
pertains to water damage to the interior walls of the building.
Id.  At best, photo number 8 describes "Sealant failure at the
perimeter of door and window frames" and warns that "Water
penetration" from cracks in the sealant can "damage interior wall
coverings, paint, and carpet."  Photo number 8 does not show any
damage to interior walls.

     Kirklin & Company, LLC., provided insurance consulting
services to Laeroc.  See Declaration of Richard Jungman (July 16,
2008) ¶ 1.  On April 12, 2002, on behalf of Laeroc, Kirklin sent
Larry Webb, vice president for risk management of Sullivan,
Curtis, Monroe ("SCM"), a letter, enclosing the March 22, 2002,
report.  See Ex. 1 to Jungman Decl.  SCM was the broker through
whom the underlying insurance policies were issued and the
company Laeroc was supposed to submit claims to.  See Ex. 19 to
Sato Decl. (copy of claims form and instructions for submitting
claims).

     McPeak Claims Service, Inc., was retained by
Westchester Fire Insurance Company to investigate the claims
presented in the letter of April 12, 2002, and the report of
March 22, 2002.  See Declaration of Kenneth McPeak (June 1, 2008)
¶¶ 1-4.  On May 7, 2002, Kenneth McPeak sent Kirklin, Laeroc's
insurance consultant, a letter noting that, as the conditions

reported in the March 2002 report might not be a covered loss, Westchester was reserving its rights pending its upcoming investigation.  <u>See</u> Ex. E to McPeak Decl.  McPeak investigated the damage on August 7, 2002.  McPeak says that he saw the problems outlined in the March 2002 report, but that, during his site visit, no one mentioned or pointed out water or mold damage to the interior walls of the hotel.  <u>See</u> McPeak Decl. ¶ 8.  On August 13, 2002, McPeak sent Peter Morgan of Laeroc a letter on behalf of Westchester, stating that coverage was being denied because the damage was not the result of a covered loss.  <u>See</u> Ex. G to McPeak Decl.

In its Opposition, Laeroc concedes that, except for the water and mold damage claims, none of the other items discussed in the March 2002 report is covered under the insurance policies at issue here.  <u>See</u> Opposition (July 31, 2008) at 32 (Docket No. 75).

On June 10, 2002, Gary Ettinger, a senior vice president of Aston, Laeroc's hotel manager, sent Kirklin, Laeroc's insurance consultant, a letter describing the insulation around the chilled water pipes as faulty and as causing water-related damage in some of the guest rooms.  <u>See</u> Ex. 1 to Declaration of Richard Jungman (July 16, 2008).  Jungman, a Kirklin officer, says that, on June 11, 2002, he faxed this letter to McPeak, the insurance adjuster hired by Westchester to

8

investigate Laeroc's claims.  See Jungman Decl. ¶ 11 (stating

that he recalls faxing that June 10, 2002, letter to McPeak).

Although Laeroc has submitted a fax cover sheet indicating that

two pages in addition to the fax cover sheet were faxed to McPeak

on June 11, 2002, see Ex. 6 to Jungman Decl., McPeak testified in

his deposition that he had not seen the June 10, 2002, letter or

the June 11, 2002, fax cover sheet.  See Deposition of Kenneth

McPeak (July 3, 2008) at 46-47 (attached to Sato Decl. at

Ex. 24).

On August 13, 2002, McPeak sent Laeroc a letter

indicating that, after an investigation, McPeak had determined

that the claims submitted to Westchester in the March 2002 report

were not covered claims.  That letter stated, "We therefore have

been instructed by Westchester Fire Insurance Company to advise

you that they must respectfully deny your claim."  See Letter

from Kenneth E. McPeak to Peter S. Morgan (Aug. 13, 2002)

(attached to McPeak Decl. as Ex. G).

Nothing in the record indicates that, as of August 13,

2002, McPeak, SCM, or Westchester had been told about any mold

damage to the interior walls of the hotel.  To the contrary, the

record suggests that Laeroc itself was not aware of a potential

mold problem until about the time coverage was denied.  For

example, on or about August 12, 2002, Aston sent Laeroc a letter

stating:

> The mold situation at Kalia Tower across the
> street has also caused us to look more
> closely at a potential mold problem in the
> Parkside.  We have done a visual inspection
> of several units and have identified areas
> where the dampness and humidity created by
> the chill water lines problems have resulted
> in an environment that is conducive to mold
> growth.  Several of these areas as [sic]
> producing what appears to be mold, although
> we are having samples tested to confirm
> whether we have a problem or not.

<u>See</u> Letter from Gary J. Ettinger (Aston) to Peter Morgan (Laeroc) (Aug. 12, 2002) (attached to Morgan Decl. as Ex. 7).  Morgan of Laeroc confirms that the first time he saw mold in the guest rooms of the hotel "was when [he] inspected the Hotel with Laeroc's consultants after August 12, 2002."  Morgan Decl. ¶ 29. Benjamin, Laeroc's president, learned about the mold after that inspection.  <u>See</u> Benjamin Decl. ¶ 19.

Immediately after receiving the letter denying insurance coverage, Laeroc sued KSK, Hawaiiana, and others concerning the damage at issue in this action and the damages and costs arising out of a dispute with Aston.  <u>See</u> Complaint, Civil No. 01-1-2013-08 (Aug, 23, 2002) (attached as Ex. W); Benjamin Decl. ¶ 43.  In May 2003, Aston/ResortQuest sued Laeroc.  The Aston action was settled in March 2005, and the KSK action was settled in March 2008.  Although the terms of the settlements are confidential, Laeroc has indicated that it has been partially reimbursed for its damages.  However, Laeroc claims that it "has

not been reimbursed a substantial amount of attorneys' fees, repair costs and other damages."  Benjamin Decl. ¶ 43.

      B.   <u>The Policies.</u>

      Westchester Fire Insurance Company insured Laeroc under Policy Number FPS 688087, covering the period from April 10, 2001, to April 10, 2002.  This policy covers losses or damages "commencing: a. During the policy period."  The policy also says, "No one may bring a legal action against us under this Coverage Part unless: . . . 2. the action is brought within 2 years after the date on which the direct physical loss or damage occurred." In the event of "loss or damage," the policy requires Laeroc to "Give us prompt notice of the loss or damage" and "give us a description of how, when and where the loss or damage occurred." The policy defines "us" as "the Company providing this insurance."  Westchester Fire Insurance Company provided the insurance.  <u>See</u> Ex. 21 to Sato Decl.

      A different entity, Westchester Surplus Lines Insurance Company, insured Laeroc under Policy Number WPS 691583, covering the period from April 10, 2002, to April 10, 2003.  This policy identically covers losses or damages "commencing: a. During the policy period."  It also states, "No one may bring a legal action against us under this Coverage Part unless: . . . 2. the action is brought within 2 years after the date on which the direct physical loss or damage occurred."  In the event of "loss or

damage," the policy identically requires Laeroc to "Give us prompt notice of the loss or damage" and "give us a description of how, when and where the loss or damage occurred."  The policy defines "us" as "the Company providing this insurance," which means Westchester Surplus Lines Insurance Company.  <u>See</u> Ex. 22 to Sato Decl.

IV.      <u>ANALYSIS.</u>

A.    <u>General Law Governing Insurance Contracts.</u>

This is a diversity action.  Federal courts sitting in diversity apply state substantive law and federal procedural law. <u>See</u> <u>Snead v. Metro. Prop. & Cas. Ins. Co.</u>, 237 F.3d 1080, 1090 (9th Cir. 2001).  When interpreting state law, a federal court is bound by the decisions of a state's highest court.  <u>Ariz. Elec. Power Coop. v. Berkeley</u>, 59 F.3d 988, 991 (9th Cir. 1995).  In the absence of a governing state decision, a federal court attempts to predict how the highest state court would decide the issue, using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Burlington Ins. Co. v. Oceanic Design & Constr., Inc.</u>, 383 F.3d 940, 944 (9th Cir. 2004) ("To the extent this case raises issues of first impression, our court, sitting in diversity, must use its best judgment to predict how the Hawaii Supreme Court would decide the issue." (quotation and brackets omitted)).

Under Hawaii law, general rules of contract construction apply to the interpretation of insurance contracts. Dawes v. First Ins. Co. of Haw., 77 Haw. 117, 121, 883 P.2d 38, 42 (1994). An insurance policy must be read as a whole and construed in accordance with the plain meaning of its terms, unless it appears that a different meaning is intended. Id. at 121, 883 P.2d at 42; First Ins. Co. of Haw. v. State, 66 Haw. 413, 423, 665 P.2d 648, 655 (Haw. 1983); see also Haw. Rev. Stat. § 431:10-237 (Michie 2004) ("[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy").

Because insurance contracts are contracts of adhesion, they must be construed liberally in favor of the insured, and any ambiguity must be resolved against the insurer. Put another way, the rule is that policies are to be construed in accordance with the reasonable expectations of a layperson. Dawes, 77 Haw. at 131, 883 P.2d at 42.

The burden is on the insured to establish coverage under an insurance policy. See Sentinel Ins. Co. v. First Ins. Co. of Haw., 76 Haw. 277, 291 n.13, 875 P.2d 894, 909 n.13 (1994) (as amended on grant of reconsideration). The insurer has the burden of establishing the applicability of an exclusion. See id. at 297, 875 P.2d at 914.

13

B.   This Action is Barred by the Two-Year Limitation
     Period Contained in the Policies.

Both policies state that a "legal action" must be
"brought within 2 years after the date on which the direct
physical loss or damage occurred."   Laeroc does not dispute
Westchester's contention that this two-year limitation period is
enforceable under Hawaii law or that the two-year limitation
period governs the present action.

In Doherty v. Hartford Ins. Group, 58 Haw. 570, 574
P.2d 132 (1978), the Hawaii Supreme Court enforced a one-year
limitation period in a marine insurance policy.   Id. at 572, 574
P.2d at 134.   The Hawaii Supreme Court stated that "there is no
question that the time limitation for filing suit contained in
the insurance policy is enforceable in this jurisdiction."   Id.
The court noted that a Hawaii statute prohibited marine insurance
provisions requiring that suit be filed less than a year from the
date of loss.   As the policy provision did not contravene the
statute, the provision was enforceable.

The Hawaii Supreme Court has also examined a one-year
limitation period in a homeowner's insurance policy.   See
Christiansen v. First Ins. Co. of Haw., 88 Haw. 136, 139-40, 936
P.2d 345, 348-49 (1998).   Although Christiansen did not expressly
say that contractual limitation periods in insurance policies
were enforceable, it tacitly enforced such periods.   The Hawaii
Supreme Court applied the limitation provision and held that its

14

requirements had been met, never suggesting the provision was unenforceable.  No state statute governs the limitation period in issue here, but this court concludes that Hawaii's courts would enforce Westchester's two-year limitation provision.

       1.    Claims for Damage Relating to the Chilled
             Water Pipes Are Untimely.

       Aston/ResortQuest, Laeroc's hotel manager, knew about the damage arising from the chilled water pipes in early January 2002.  <u>See</u> Ex. 1 to Sato Decl. (January 7, 2002, report describing the condensation damage to the hotel "from saturated chill water lines"); Ex. 2 to Sato Decl. (January 8, 2002, report describing damage to the hotel "from condensation occurring on saturated chill water risers"); Laeroc's Answer to Interrogatories No. 9, 10 (May 6, 2008) (indicating that Aston knew about the water and mold damage in January 2002).  Laeroc admits that it had actual knowledge of the damage arising from the chilled water pipes by at least April 2002.  <u>See</u> Benjamin Decl. ¶ 17 (indicating that Benjamin, Laeroc's president, was told about the condensation damage when he visited the hotel in April 2002).  Laeroc did not file the original California state court Complaint until July 30, 2004, more than two years after the damage caused by the chilled water pipes was known.  Unless Laeroc can demonstrate some reason excusing its delay, its claim for damages arising out of the chilled water pipes action is time-barred.

Laeroc argues that the two-year limitation period should be tolled from the time it submitted the claim until the time Westchester denied the claim.  See Prudential-LMI Com. Ins. v. Sup. Ct. of San Diego County, 798 P.2d 1230 (Cal. 1990) (tolling California's one-year statute of limitation from the time an insurance company receives a claim until the time it decides the claim).  Laeroc says that it informed Defendants of the damage on April 12, 2002, see Laeroc's Answer to Interrogatories No. 11, 12 (May 6, 2008), when Kirklin sent SCM a letter that enclosed the March 2002 report.  See Ex. 1 to Jungman Decl.  Laeroc claims that, although McPeak sent a letter to it denying coverage on behalf of Defendants on August 13, 2002, that letter did not specifically deny the water and mold damage claims arising out of the chilled water pipes.  Laeroc argues that the limitation period should therefore be indefinitely tolled from April 12, 2002.  The court is unpersuaded.

First, as discussed above, the March 2002 report did not mention water or mold damage arising out of the chilled water pipes.  In fact, it failed to mention any damage connected with the chilled water pipes.  While an insured's notice of damage to an insurer need not be precise as to causation if the cause is latent, the damages identified--"fungus and mildew"--were clearly tied to problems with the exterior paint and windows, not to the chilled water pipes.  See Ex. 6 to Sato Decl.  The damage at

16

issue in the present suit is not damage related to exterior paint or windows.  Because Laeroc did not submit a claim to Defendants regarding the mold and water problems at issue in this action on April 12, 2002, the limitation period was not tolled by the submission of the original claim on April 12, 2002.

Even if the court accepted Laeroc's argument that it submitted the damage claim arising from the chilled water pipes to Westchester on April 12, 2002, the claim would still be untimely.  Westchester clearly denied all of the claims submitted in April 2002 in its August 13, 2002, letter.  Even if the court assumes that Laeroc did not receive the letter until August 20, 2002, see Ex. 1 to Benjamin Decl., and therefore tolls the period from April 12 to August 20, 2002, a period of 130 days, the claim is untimely.[2]  Laeroc did not file this action until July 30, 2004.  Accordingly, if the "physical loss or damage occurred" within the 130-day period before July 30, 2002 (between March 22, 2002, and July 30, 2002), the action would be timely, assuming

---

[2]The court uses this August 20, 2002, date because it is the most generous to Laeroc.  Benjamin states in his declaration that he does not remember when he received McPeak's August 13, 2002, letter.  He says that the "received" stamp on Exhibit 1 to his declaration, which indicates a receipt date of August 20, 2002, was not his stamp, but instead the stamp of his attorney.  Benjamin states that he would not have waited more than a couple of days after receiving the letter to fax it to his attorney on August 20, 2002.  See Benjamin Decl. ¶ 22.  Whether Laeroc received the August 13, 2002, letter on August 20 or a few days before that makes no difference to this motion.  If Laeroc received the letter before August 20, 2002, the period tolled would have been less than 130 days.

17

that equitable tolling applies.  It is undisputed, however, that Aston/ResortQuest, Laeroc's hotel manager, knew about the damage arising from the chilled water pipes in January 2002.  This indicates that the "physical loss or damage occurred" at least by January 2002.

The court is unpersuaded by Laeroc's argument that this case involves "progressive" damage such that the limitation period did not begin to run until the time the hotel was closed to remediate the water and mold problem.  Laeroc argues that the period should not accrue until it fully understood the scope of the problem when it closed the hotel.  In support of this "delayed discovery" contention, Laeroc cites a California case, Prudential-LMI, 798 P.2d 1230.  That case, however, does not stand for the proposition that an insured is not required to file a complaint in court within the contractual time limitation if the damage is ongoing or "progressive."  Instead, Prudential-LMI stands for the proposition that an insured's suit will be deemed timely if filed within the contractual time period.  In that case, the contractual period was one year after appreciable damage occurred and was or should have been known to the insured such that a reasonable insured would have been aware that his or her notification duty under an insurance policy had been triggered.  Id. at 1238.

18

In Prudential-LMI, the insured noted extensive cracks in the foundation of a building when replacing the floor covering in 1985. One month later, the insured filed a claim with the insurer. In August 1987, shortly before the insurance company concluded its investigation and denied the claim, the insured filed a state court law suit. Id. at 1233-34. The California Supreme Court determined that the insured had timely filed the action. It concluded that the limitation period began to run when "appreciable damage occurr[ed] such that a reasonable insured would be on notice of a potentially insured loss." Id. at 1234. The California Supreme Court then concluded that, while the insurance company was investigating the claim, the contractual limitation period was tolled.

Even if Hawaii courts adopted the rationale of Prudential-LMI, Laeroc's claims would be barred by Westchester's two-year contractual limitation period. Under the terms of the management agreement between Laeroc and Aston/ResortQuest, Aston/ResortQuest "was supposed to give Laeroc a[n] assessment of the physical condition of the hotel." See Benjamin Decl. ¶ 13. As Laeroc's agent, Aston/ResortQuest had a duty to inform Laeroc of the damage, and its knowledge of the damage is imputed to Laeroc. See Imperial Fin. Corp. v. Fin. Factors, Ltd., 53 Haw. 203, 206, 490 P.2d 662, 664 (1971) (noting the general rule that "the knowledge of an agent which he is under a duty to disclose

19

to his principal or to another agent of the principal, is to be imputed to the principal").

Laeroc argues that it and Aston/Resortquest were "adverse" in 2002.  However, Laeroc recognizes that it had an agency relationship with Aston/ResortQuest at the time, as it admits that it had knowledge of the damage to the interior walls when Aston/ResortQuest had that knowledge:

> INTERROGATORY NO. 9:
>
> If YOU are only claiming damages to the INTERIOR WALLS, state when YOU first became aware of WATER DAMAGE to those walls.
>
> ANSWER: ResortQuest Hawaii, LLC ("Aston"), Laeroc Waikiki Parkside, LLC's ("Laeroc") management company, first became aware of WATER DAMAGE in January 2002.
>
> INTERROGATORY NO. 10:
>
> If YOU are only claiming damages to the INTERIOR WALLS, state when YOU first became aware of MOLD DAMAGE to those walls.
>
> ANSWER: Aston first became aware of the MOLD DAMAGE (inclusive of the corridor walls) in January 2002.

See Ex. U.

Thus, Aston's knowledge is imputed to Laeroc.  If Aston did not promptly notify Laeroc of damage, that is a matter between Laeroc and Aston.  That does not extend any period under Westchester's policies.

      2.    Damage Claims Arising Out of the Chilled
            Water Pipes Problem Discussed in the July 10,
            2002, Letter Are Time-Barred.

Jungman, who was employed by Kirklin (Laeroc's insurance consultant), says that, on June 11, 2002, he faxed McPeak (the independent insurance claims adjuster hired by Westchester) a letter that discussed damage arising from the chilled water pipes.  See Jungman Decl. ¶ 11.  McPeak says he did not receive that fax.  See McPeak Depo at 46-47.  There is therefore an issue of fact as to whether Laeroc tendered the damage claims arising out of the chilled water pipes to McPeak in June 2002.  There is also an issue of fact as to whether McPeak was authorized to accept the tender of a claim.  Compare Ex. E (letter from McPeak reserving Westchester's rights) with Ex. 19 to Sato's Decl. (telling Laeroc how claims should be submitted to SCM).  Even assuming McPeak was authorized to and did receive the June 2002 claim, this action is untimely.

As discussed above, Laeroc's agent knew of the damage from the chilled water pipes in January 2002.  Laeroc itself knew of the damage by the first two weeks of April 2002.  Even if the court tolls the period between June 11, 2002, and August 20, 2002 (70 days), more than two years elapsed between the date the "physical loss or damage occurred" and when this action was filed in California state court on July 30, 2004.  If the 70 days are excluded from the countable period, the "physical loss or damage"

had to have occurred on or after May 21, 2002, to make this suit timely.  The damage clearly preceded that date.

Indeed, the first insurance policy, number FPS 688087, only covers damage "commencing" during the policy period, which was from April 10, 2001, to April 10, 2002.  If the damage "commenced" on or after May 21, 2002, it would not be covered at all by the first policy.  When the damage "commenced" is not established by the record, but Laeroc's earlier litigation against the previous owner of the hotel suggests that, at least at one time, Laeroc was contending that the damage "commenced" before Laeroc bought the hotel in August 2001.  The filing of the present action in 2004 was obviously beyond the two-year limitation period set forth in both of Westchester's policies.

The August 12, 2002, letter from Ettinger (Aston) to Morgan (Laeroc) suggests that Laeroc first became aware of potential mold damage arising out of the chilled water pipes on or about August 12, 2002.  See Ex. 7 to Morgan Decl.  This was one day before McPeak mailed the letter denying coverage to Laeroc.  See Ex. 1 to Benjamin Decl.  That is, the water damage caused by the chilled water lines was apparent to Laeroc by at least April 2002, see Morgan Decl. ¶ 29, but that water damage was not viewed as mold at the time Laeroc submitted either the April 2002 claim or the June 2002 claim (assuming the June 2002 claim was indeed submitted).  In fact, nothing in the record

indicates that Laeroc ever submitted a claim to its insurer for mold damage to interior surfaces.  Under the terms of the insurance policies, Laeroc was obligated to provide its insurers with notice of the loss or damage caused by the mold.  Its failure to do so bars the breach of contract, bad faith, and punitive damage claims asserted in this action.

At some point after August 20, 2002, Laeroc learned that the cause or partial cause of the mold growth in some of the interior walls of the hotel may have been something other than the chilled water pipes.  <u>See</u> Declaration of Bruce White (July 21, 2008) ¶ 12 ("In March 2003, . . . mold growth [was] seen in the Hotel away from the demising wall containing the chilled water lines such as the demising wall opposite of the chilled water lines, the ceilings of the guest rooms and corridors of the Hotel."); ¶ 21 ("In the summer of 2003, the project manager at the Hotel opened up a number of bathroom walls containing the Hotel's vertical waste lines and discovered that in many places these waste line[s] were cracked and contained holes.  The waste lines run vertically in the Hotel in a bathroom wall in each guest room that is opposite the guest room wall containing the chilled water line."); ¶ 22 ("Within the bathroom walls containing the waste lines that were opened I saw a large amount of mold growth.").  Nothing in the record indicates that Laeroc submitted a claim for the mold growth caused by the allegedly

23

problematic waste lines that were located in the walls opposite from the walls containing the chilled water pipes.  Because Laeroc failed to submit a claim based on damage caused by the waste lines, it may not now maintain breach of contract, bad faith, or punitive damage claims based on the waste lines.

Bruce White, a mold remediation consultant, now opines that the cause of the mold in the interior walls is a combination of "condensation of humid outside air infiltrating into the guest room walls plus water that may have infiltrated through the sliding doors into the guest room."  To the extent this action can be said to be based on such damage, and to the extent this "humid air infiltration" damage is distinct from the chilled water pipe damage, Westchester is similarly entitled to summary judgment.  Laeroc submits no evidence that it submitted any claim for insurance coverage for this damage.

V.        CONCLUSION.

For the reasons set forth above, the Motion for Summary Judgment (Docket Number 59) is granted.  All other pending motions are moot.  The Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 22, 2008.



 /s/ Susan Oki Mollway 
Susan Oki Mollway
United States District Judge

24